AF Approval ______ Chief Approval ______

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 8:22-cr-332-VMC-TGW

DANIEL DAVID ESPINOZA

# PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by and through the Fraud Section of the Criminal Division of the United States Department of Justice (the "Fraud Section") and Roger B. Handberg, United States Attorney for the Middle District of Florida, (collectively, the "United States"), and the defendant, DANIEL DAVID ESPINOZA, and the attorney for the defendant, Thomas H. Barnard, Esq., mutually agree as follows:

## A. Particularized Terms

### 1. Count Pleading To

The defendant shall enter a plea of guilty to Count One of the Information Count One charges the defendant with the offense of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.

### 2. Maximum Penalties

Count One carries a maximum sentence of 10 years' imprisonment; a fine of not more than $250,000 or, alternatively, not more than the greater of twice the gross

pecuniary gain derived from the offense or twice the gross pecuniary loss to a person other than the defendant; a term of supervised release of not more than three years; and a special assessment of $100.

With respect to the charged offense, the Court shall order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3. Elements of the Offense

The defendant acknowledges his understanding of the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One, conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, are:

First: that two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit health care fraud, in violation of 18 U.S.C.§ 1347, as charged in the information; and

Second: the defendant knew the unlawful purpose of the plan and willfully joined in it.

The elements of the offense of health care fraud, in violation of 18 U.S.C. § 1347, are:

First: the defendant knowingly executed, or attempted to execute, a scheme or artifice to defraud a health-care benefit program, or to obtain money or property owned by, or under the custody or control of, a health-care benefit program by means of false or fraudulent pretenses, representations, or promises;

| | |
|---|---|
| Second: | the health care benefit program affected interstate commerce; |
| Third: | the false or fraudulent pretenses, representations, or promises related to a material fact; |
| Fourth: | the defendant acted willfully and intended to defraud; and |
| Fifth: | the defendant did so in connection with the delivery of or payment for health-care benefits, items, or services. |

4. No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida and the Fraud Section, agree not to charge defendant with any other federal criminal offenses known to the United States Attorney's Office or the Fraud Section at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

5. Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to the Medicare Program in the amount of $6,799,581.52.

6. Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this

Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

7. Guidelines Level Calculation

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant agree that, although not binding on the probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed.

Regarding the offense of conspiracy to commit health care fraud, as charged in Count One, the guidelines calculation is as follows:

a. The defendant's base offense level is six (6), in accordance with USSG §2B1.1(a)(1) of the Sentencing Guidelines.

b. The defendant's offense level shall be increased by twenty (20) levels pursuant to USSG §2B1.1(b)(1)(K) because the intended loss to the Medicare Program, caused by the jointly undertaken criminal activity as defined by USSG §1B1.3(a)(1)(B), was more than $9,500,000 but less than $25,000,000.

c. The defendant's offense level shall be increased by three (3) levels pursuant to USSG §2B1.1(b)(7) because the intended loss to a government health care program under USSG §2B1.1(b)(1) was greater than $7,000,000.

d. The defendant's offense level shall be increased by two (2) levels pursuant to USSG §2B1.1(b)(10) because (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; and (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting

sophisticated means, resulting in an adjusted offense level of thirty-one (31).

e. The defendant's offense level shall be increased by two (2) levels pursuant to USSG §3B1.1(c) because the defendant's role in the offense was that of an organizer, leader, manager or supervisor, resulting in a total offense level of thirty-three (33).

The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8. Acceptance of Responsibility—Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to make a request, pursuant to USSG

§3E1.1(b), for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the Offices, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9. Low End

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a sentence at the low end of the applicable guideline range, as calculated by the Court. The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

10. Cooperation—Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for

interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

11. <u>Use of Information—Section 1B1.8</u>

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining

the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

12. Cooperation—Responsibilities of Parties

a. The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b. It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1) The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2) The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the

event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3) The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4) The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents,

and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5) The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

13. Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(7), whether in the possession or control of the United States, the defendant or the defendant's nominees. The assets to be forfeited specifically include, but are not limited to, the $357,482.00 in proceeds the defendant admits that he personally obtained, as the result of the commission of the offense to which the defendant is pleading guilty. The defendant acknowledges and agrees that: (1) the defendant obtained this amount, in concert with his co-conspirators, as a result of the commission of the offense, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United

States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offense of conviction.

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant further agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Fed. R. Crim. P. 11 and USSG §1B1.8 will not protect

from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the plea agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding

upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

**B. Standard Terms and Conditions**

1. Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount of $100, payable to "Clerk, U.S.

District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2. Supervised Release

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3. Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4. Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5. Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this plea agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6. Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7. Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing

Guidelines, except on the grounds that (a) the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the sentence exceeds the statutory maximum penalty; or (c) the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8. Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida, and the Fraud Section, and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9. Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10. Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney

and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11. Factual Basis

The defendant is pleading guilty because the defendant is in fact guilty. The defendant certifies that the defendant does hereby admit that the facts set forth below are true, and, were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

## FACTS

The United States and the defendant stipulate to the following facts:

Beginning in or around January 2017, and continuing through in or around September 2020, in the Middle District of Florida and elsewhere, the defendant, DANIEL DAVID ESPINOZA ("ESPINOZA"), knowingly participated in a conspiracy with his co-defendants, PABLO GARCES CAMUS ("PABLO CAMUS") and SHANE PAUL CAMUS ("SHANE CAMUS") and others (collectively, the "conspirators"), to commit the offense of health care fraud in which they obtained and attempted to obtain money from the Medicare program by submitting false and fraudulent claims for durable medical equipment ("DME") such as orthotic braces. The conspirators created and acquired several DME front companies, as described below, for the purpose of, among other things, spreading illegal DME claims across several entities to evade Medicare scrutiny.

*The Conspirators' Companies*

Over the course of the conspiracy, the conspirators formed and operated several DME businesses including Primary Choice Medical Supplies, LLC

("Primary Choice"), Total Solutions Medical Supplies, LLC ("Total Solutions"), Integrity Medical Supplies, LLC ("Integrity"), Newave Medical Supplies, LLC ("Newave Medical") and Halo Medical Supplies, LLC ("Halo"), that together submitted claims to Medicare totaling approximately $15,126,493.91, and that resulted in payments to the conspirators of approximately $6,799,581.52.

In or around July 2010, PABLO CAMUS established a Florida corporation known as DBOSS Marketing, Inc. ("DBOSS"), with a principal place of business in Davie, Florida, and listing ESPINOZA as DBOSS's registered agent. The corporation filed an Annual Report in April 2011 that listed ESPINOZA as President. In or around October 2012, the corporation filed Amendments to the Articles of Incorporation that listed PABLO CAMUS as Vice-President of the corporation.

PABLO CAMUS had previous experience owning and operating a call center in the Dominican Republic as early as 2010. PABLO CAMUS worked with ESPINOZA and others to operate a call center and generate leads used by other companies to order diabetic supplies in return for a percentage of the paid amounts. PABLO CAMUS operated the call center in the name of his Florida company, DBOSS, and, in or around September 2010, PABLO CAMUS incorporated DBOSS in the Dominican Republic and listed himself as an officer.

In or around July 2015, PABLO CAMUS established a Florida company known as DBOSS Enterprises, LLC ("DBOSS Enterprises"), with a business address

in Davie, Florida, that was operated as a call center. In or about 2016, PABLO CAMUS operated the call center to generate leads for another outside company that sold DME orthotic braces. Because PABLO CAMUS had limited experience with braces and telemedicine, he reached out to his friend, ESPINOZA, who had experience with marketing for diabetic supplies and organizing call centers. ESPINOZA advised PABLO CAMUS concerning the structure of the DBOSS Enterprises call center and helped create operating procedures.

In or around March 2017, PABLO CAMUS and his son, SHANE CAMUS, established a Florida company known as Primary Choice, with a business address in Davie, Florida, and for which SHANE CAMUS was listed as the registered agent and operating manager. SHANE CAMUS did the paperwork to get the company set up and registered with Medicare. Primary Choice obtained a Medicare National Provider Identifier number (an "NPI number") identifying it as a Medicare provider on claims for reimbursement submitted to Medicare under SHANE CAMUS's authorization who was listed as the manager and owner. Primary Choice was operated as a DME sales company concentrating on orthotic braces for Medicare beneficiaries. In or around April 2018, PABLO CAMUS and SHANE CAMUS decided to move Primary Choice to Winter Haven, Florida, to avoid the higher Medicare scrutiny in South Florida.

PABLO CAMUS and SHANE CAMUS decided to open more DME companies to bill more but also to spread Medicare claims among more companies

to avoid Medicare scrutiny. In order to generate more leads, PABLO CAMUS opened a new call center in the Dominican Republic called Quality Control Center ("QCC"). PABLO CAMUS decided to use telemedicine to convert QCC leads to doctors' orders. Under PABLO CAMUS's direction, QCC employees made recorded calls to beneficiaries, and a processing team would upload the information to various third-party telemedicine companies by computer. The telemedicine companies were paid a flat fee per consultation, and there was no pre-existing doctor-patient relationship with any of the beneficiaries. The telemedicine companies would send the completed doctors' orders to PABLO CAMUS's and SHANE CAMUS's DME companies that would, in turn, bill Medicare. The orthotic braces then were shipped by a wholesaler directly to the beneficiaries.

In or around December 2017, PABLO CAMUS and SHANE CAMUS established a North Carolina company known as Integrity Medical Supplies, with its principal offices in Burlington, North Carolina, and SHANE CAMUS was listed as registered agent and owner. PABLO CAMUS chose this location because he had a friend there who had a drop-ship business to ship the braces. Integrity obtained a Medicare NPI number identifying it as a Medicare provider on claims for reimbursement submitted to Medicare under SHANE CAMUS's authorization, who was listed as the owner. Integrity was operated as a DME sales company concentrating on orthotic braces for Medicare beneficiaries.

In or around February 2018, PABLO CAMUS established a Florida company known as Total Solutions, with a business address in Davie, Florida, and listed himself as the operating manager. Total Solutions obtained a Medicare NPI number identifying it as a Medicare provider on claims for reimbursement submitted to Medicare under PABLO CAMUS's authorization who was listed as the owner. On the application to Medicare, Total Solutions listed its business address in Winter Haven, Florida, at the same location as Primary Choice. PABLO CAMUS chose Winter Haven because he thought it was "too hot" in South Florida, meaning too much fraud and Medicare scrutiny. Total Solutions was operated as a DME sales company concentrating on orthotic braces for Medicare beneficiaries.

In or around 2018, ESPINOZA went to work for PABLO CAMUS with the hope that he could become PABLO CAMUS's partner. In order to "pay for his ticket into the partnership," in or around February 2018, ESPINOZA opened a marketing company called Newave Marketing, LLC, with a mailing address in Coral Springs, Florida and, at PABLO CAMUS's direction, listed himself as registered agent and manager. PABLO CAMUS hired ESPINOZA to do marketing for the DME businesses. PABLO CAMUS's and SHANE CAMUS's DME companies (Primary Choice and Total Solutions) each paid weekly fees to Newave Marketing that were to cover ESPINOZA's salary, expenses at the QCC call center to generate the leads, and the cost of telemedicine to convert leads to doctors' orders.

In or around May 2018, PABLO CAMUS established a Florida company known as First Choice Billing Solutions, and named ESPINOZA as registered agent and manager of the company. First Choice was created for the purpose of submitting claims to Medicare "in-house" for all conspirators' DME companies rather than hiring outside billing contractors, so that the conspirators could more easily control and supervise the billing process. In or around July 2020, PABLO CAMUS named his wife as registered agent and manager of First Choice.

ESPINOZA wanted to be a partner in the DME companies, but PABLO CAMUS wanted only his son, SHANE CAMUS, to be his partner. Then, in March 2019, ESPINOZA opened his own DME company, Newave Medical Supply, LLC ("Newave Medical") with a principal place of business in Winter Haven, Florida, and, at PABLO CAMUS's direction, listed himself as manager. Newave Medical obtained a Medicare NPI number identifying it as a Medicare provider on claims for reimbursement submitted to Medicare under ESPINOZA's authorization who was listed as owner. On the application to Medicare, Newave Medical listed its business address in Winter Haven, Florida. Newave Medical was operated as a DME sales company concentrating on orthotic braces for Medicare beneficiaries.

PABLO CAMUS and SHANE CAMUS thought it could be lucrative to organize and sell DME companies. They knew it would take about three months and $20,000 to set up a DME company, but people were willing to pay $100,000 for a DME company already set up and ready to bill Medicare. PABLO CAMUS and

SHANE CAMUS organized and sold Results Medical Supplies, LLC, and Sure Care, LLC.

In June 2019, PABLO CAMUS and SHANE CAMUS established a Florida company known as Halo Medical Supplies, LLC, and listed the name of SHANE CAMUS's fiancée as registered agent and manager. Halo obtained a Medicare NPI number identifying it as a Medicare provider on claims for reimbursement submitted to Medicare under the authorization of SHANE CAMUS's fiancée who was listed as the owner. Halo was operated as a DME sales company concentrating on orthotic braces for Medicare beneficiaries.

*Medicare Regulations Pertaining to DME Claims*

The Medicare Program ("Medicare") was a federal health care benefit program that provided items and services to individuals who were (a) age 65 or older, (b) had certain disabilities, or (c) had end-stage renal disease. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services ("HHS"). Individuals who received Medicare benefits were called "beneficiaries."

Medicare was made up of several component "parts" that covered different items and services. Medicare Part A covered inpatient hospital stays. Medicare Part B covered, among other items and services, outpatient care and supplies, and DME, such as braces and other orthotic devices. Under Medicare Part B, beneficiaries could only receive Medicare-covered DME from suppliers or "providers" that were

enrolled in Medicare with an NPI number used to identify their claims for reimbursement. To help administer Medicare, CMS contracted with private insurance companies called "Medicare Administrative Contractors" or "MACs" that enrolled DME suppliers in Medicare and processed Medicare claims.

To enroll in Medicare Part B, a DME supplier was required to submit a completed enrollment application known as "Form CMS-855S," to Medicare. The Form CMS-855S listed many standards necessary to obtain and to retain Medicare billing privileges as a DME supplier. Pursuant to those standards, a DME supplier was required to provide complete and accurate information on the Form CMS-855S and, further, report any changes to such information to the NSC MAC within 30 days.

Medicare is a trust-based government program that relies upon the honesty of providers to comply with all regulations and only to submit claims that are accurate, authorized, and medically necessary. The Form CMS-855S required the signature of an "authorized official." The act of signing, or authorizing such signing, bound the DME supplier and official(s) to abide by all "laws, regulations, and program instructions" for Medicare. It also bound and certified the DME supplier and official(s) to the following terms, among others:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the [Medicare Administrative Contractor]. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program

> instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a–7b(b). . . .
> * * *
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

To enroll in Medicare, a DME supplier was required to complete an accreditation process by an organization approved by CMS. One CMS-approved organization that could perform such accreditation was known as the Board of Certification/Accreditation or the "BOC." The BOC had a set of standards that a DME supplier had to meet for accreditation, which were tested at on-site inspections and random re-inspections.

To bill Medicare, the DME supplier required two unique identification numbers: (a) a "National Provider Identifier" or "NPI;" and (b) a "Provider Transaction Access Number" or "PTAN." To issue NPIs, CMS developed the National Plan and Provider Enumeration System, which assigned NPIs to providers, including DME suppliers. Medicare providers and DME suppliers used their identification numbers to submit claims for reimbursement to the DME MAC electronically through a computer system using a standard format.

Medicare required that a DME supplier complete a Common Electronic Data Interchange ("CEDI") agreement for access to the computer system with a DME MAC. The CEDI agreement required the DME supplier to agree to several terms and conditions, including:

a. that it would be responsible for all Medicare claims submitted to CMS or a designated CMS contractor by itself, its employees, or its agents;

b. that it would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so, and certify that required beneficiary signatures, or legally authorized signatures on behalf of beneficiaries, were on file;

c. that it would submit claims that are accurate, complete, and truthful;

d. that it would affix the CMS-assigned unique identifier number (submitter ID) of the provider on each claim electronically transmitted to the A/B MAC, CEDI, or other contractor if designated by CMS;

e. that the CMS-assigned unique identifier number (submitter identifier) or NPI constituted the provider's (or the DME supplier's) legal electronic signature and its assurance that services were performed as billed; and

f. that it would acknowledge that all claims would be paid from Federal funds, that the submission of such claims was a claim for payment under the Medicare program, and that anyone who misrepresented or falsified or caused to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement was, upon conviction, subject to a fine and/or imprisonment under applicable Federal law.

When filing claims, the DME supplier was required to submit certain information relating to a specific patient or beneficiary. The information necessary for a DME claim included:

a. the type of service provided, identified by an "HCPCS" code (meaning "Healthcare Common Procedure Coding System");

b. the date of service or supply;

c. the referring physician's NPI;

d. the charge for such services;

e. patient's diagnosis;

f. the NPI for the DME entity seeking reimbursement; and

g. certification by the DME provider that the supplies are medically necessary.

Further, before submitting a claim for an orthotic brace to the DME MAC, a supplier was required to have on file the following:

a. written documentation of a verbal order or a preliminary written order from a treating physician;

b. a detailed written order from the treating physician;

c. information from the treating physician concerning the beneficiary's diagnosis;

d. any information required for the use of specific modifiers;

e. a beneficiary's written assignment of benefits; and

f. proof of delivery of the orthotic brace to the beneficiary.

*Proper Telehealth Services for Medicare Beneficiaries*

Telemedicine was a means of connecting patients to providers via a telecommunication technology, such as video-conferencing. Telemedicine companies hired physicians and other licensed providers to furnish telemedicine services to individuals. Telemedicine companies typically paid "treating providers" a fee to consult with patients. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included,

among others: (a) that the beneficiary was typically located in a rural area (meaning, outside a "Metropolitan Statistical Area" or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio- and video-telecommunications system; and (c) that the beneficiary was at a practitioner's office or a specified medical facility—not at home—during the telehealth service furnished by a remote practitioner. In or around March 2020, in response to the COVID-19 pandemic, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

*The Conspirators' Fraudulent Business Activities*

The conspirators ran a telemarketing call center operation from the Dominican Republic using DBOSS Enterprises and QCC. The operation generally targeted the Medicare-aged population in the United States to generate "leads" for DME brace orders by "cold-calling" persons without any knowledge of whether those persons needed orthotic braces. The conspirators obtained personally identifiable information ("PII"), such as names, dates of birth, and Medicare ID numbers, for the Medicare beneficiaries they targeted using DBOSS Enterprises and QCC, the telemarketing call centers in the Dominican Republic. To generate the leads, DBOSS Enterprises and QCC representatives, at the direction of the conspirators, called Medicare beneficiaries to inquire about, among other

information, the beneficiaries' Medicare eligibility, their health status, and whether they wanted DME braces. DBOSS Enterprises and QCC representatives, at the direction of conspirators, made electronic records and voice recordings of the calls to Medicare beneficiaries for the purpose of generating fraudulent DME brace orders.

The conspirators caused the electronic transmission of Medicare beneficiaries' PII to purported medical practitioners working for purported telemedicine vendors. The vendors, in turn, created orders for DME orthotic braces, purportedly signed by medical professionals who did not have a doctor-patient relationship with the beneficiaries, did not review the beneficiaries' medical records or perform the necessary examinations, and did not adequately determine if the DME was medically necessary. Some of the Medicare beneficiaries who received orthotic braces from the conspirators' companies were never contacted by any telemedicine provider at all. The purported telemedicine vendors provided the DME orders for most of the Medicare beneficiaries named in the leads regardless of their need for telemedicine services or the location of the beneficiary. The purported telemedicine vendors electronically transmitted, or caused to be transmitted, the DME orders to the conspirators who used them as support for fraudulent, illegal DME claims they submitted to Medicare through their various companies. The conspirators then shipped the orthotics or caused the orthotics to be shipped to the beneficiaries.

The conspirators moved the business location of some of their DME front companies, such as Primary Choice and Total Solutions, from the Southern District

of Florida to the Middle District of Florida in order to evade and minimize scrutiny by Medicare regulatory authorities.

*Beneficiary Complaints*

Many of the beneficiaries who received orthotic braces from one or more of conspirators' DME companies filed complaints with Medicare. Investigators collected a sample of more than 30 written complaints Medicare received from beneficiaries regarding Primary Choice, Total Solutions, Integrity and Newave Medical. In general, beneficiaries variously reported that (1) they did not need the braces they received by mail, (2) they did not order the braces, (3) they had never heard of the DME company that sent the braces, and (4) they had never heard of the doctor who ordered the braces. Some beneficiaries refused delivery or returned the braces to the DME company. One beneficiary has Alzheimer's disease and could not have communicated with anyone by telephone. Another beneficiary is an amputee who would have no use for an orthotic brace. These complaints caused Medicare regulatory authorities to conduct an audit and refer the matter to law enforcement for investigation.

During the course of the investigation, federal agents interviewed beneficiaries whose information was consistent with the above. One beneficiary, in particular, received three orthotics (sleeve, knee, and lumbar braces) from Primary Choice that were billed to Medicare all on the same day. The beneficiary returned the orthotics because she did not need them; they did not fit her anyway because she is a big

person, and they were too small. The beneficiary had never heard of the physician who prescribed the orthotics, and she denied ever speaking with that physician or any other doctor about her need for orthotics.

*The Conspirators' Fraudulent DME Medicare Claims*

During the course of the conspiracy, the conspirators submitted or caused to be submitted fraudulent, illegal DME claims to Medicare through Total Solutions, totaling approximately $4,341,118.25 and resulting in payments from Medicare to the conspirators of approximately $2,089,259.83.

During the course of the conspiracy, the conspirators submitted or caused to be submitted fraudulent, illegal DME claims to Medicare through Primary Choice, totaling approximately $4,792,093.73 and resulting in payments from Medicare to the conspirators of approximately $2,149,038.01.

During the course of the conspiracy, the conspirators submitted or caused to be submitted fraudulent, illegal DME claims to Medicare through Integrity, totaling approximately $3,151,893.46 and resulting in payments from Medicare to the conspirators of approximately $1,347,567.17.

During the course of the conspiracy, the conspirators submitted or caused to be submitted fraudulent, illegal DME claims to Medicare through Halo, totaling approximately $1,282,407.55 and resulting in payments from Medicare to the conspirators of approximately $507,576.35.

During the course of the conspiracy, the conspirators submitted or caused to be submitted fraudulent, illegal DME claims to Medicare through Newave Medical, totaling approximately $1,558,980.92 and resulting in payments from Medicare to the conspirators of approximately $706,140.16.

During the course of the conspiracy, the conspirators submitted or caused to be submitted fraudulent, illegal DME claims to Medicare from all their DME companies totaling approximately $15,126,493.91 that resulted in reimbursement payments from Medicare to the conspirators totaling approximately $6,799,581.52.

During the course of the conspiracy, each of the conspirators operated various business affairs of the DME companies and directly supervised and participated in various facets of the conspiracy to promote and achieve the object of the conspiracy and to conceal the purposes of the conspiracy and the acts committed in furtherance thereof, including operation of the call centers to generate leads, transmittal of the leads to the purported telemedicine vendors, acquiring DME orders for Medicare beneficiaries, shipping the orthotic braces to Medicare beneficiaries, creation and submission of DME claims to Medicare, and receipt of reimbursement proceeds from Medicare that were converted to their own use and enjoyment.

12. <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other

promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13. Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 14th day of September, 2022.

ROGER B. HANDBERG
United States Attorney

LORINDA I. LARYEA
Acting Chief
United States Department of Justice
Criminal Division, Fraud Section

Daniel David Espinoza
Defendant

John A. Michelich
Senior Litigation Counsel
United States Department of Justice
Criminal Division, Fraud Section
Special Florida Bar No. A5502197
John.Michelich@usdoj.gov
office 813-274-6069

Thomas H. Barnard, Esq.
Attorney for Daniel David Espinoza

Rachelle DesVaux Bedke
Assistant United States Attorney
Chief, Economic Crimes Section